J^PETTIGREW, J.
In this case, the foster parents of K.A.M. appeal the trial court’s judgment vacating the previous adjudication of K.A.M. as a child in need or care and placing K.A.M. in the custody of her paternal grandparents. After a thorough review of the record, we affirm.
FACTS AND PROCEDURAL HISTORY
K.A.M. was born on April 8, 1997, at Earl K Long Hospital. The child was considered to be “high-risk” because her mother had no prenatal care. K.A.M. had to be given oxygen for six days following her birth. On April 17, 1997, tests revealed the presence of cocaine in the child’s system at birth. Consequently, K.A.M. was removed from the custody of her mother, L.M., and placed in foster care with H.W. and M.W. (“foster parents”). At that time, K.A.M.’s paternity had not yet been established.
On April 22, 1997, a hearing was held at which time it was revealed that K.A.M. was her unmarried mother’s fifth child, and the second to be born with cocaine in her system. The custody of the child was continued with the State of Louisiana, through the Department of Social Services, Office of Community Services (“OCS”), and the State was ordered to institute proceedings to adjudicate the child in need of care. K.A.M. was subsequently adjudicated in need of care at a hearing on September 18, 1997, and a judgment was signed accordingly on October 7, 1997. Thereafter, K.A.M. remained in the custody of the State and continued living with her foster parents. During an annual dispositional review hearing on May 4, 1999, it was revealed that the child’s father, J.N., who had been absent since the child’s birth, had acknowledged paternity by a notarial act. After the hearing, the trial court, based on its understanding that the parties had reached an agreement, maintained custody with the State “contingent on the actual physical care and control” of the child being placed with her paternal grandparents.
At a status conference on July 6, 1999, the foster parents who had cared for the child for more than two years petitioned the court seeking an opportunity to be heard and to present evidence concerning the best interests of the child with regard to permanent placement. The trial court set a specific visitation schedule between the foster parents and the paternal grandparents, such that the foster parents would have weekend 13visitations with K.A.M. The court further ordered J.N. to submit to a DNA test to confirm paternity.
At a review hearing on August 6, 1999, the foster parents’ request to be heard and to present evidence was denied. The DNA Parentage Test Report, which was introduced into evidence, revealed a 99.92 percent probability of paternity. Further, a home study dated June 4, 1999, was submitted to the court and introduced into evidence. According to the report, OCS recommended placement of K.A.M. with her paternal grandparents. The OCS worker who had conducted the home study noted that “[she had] observed [K.A.M.] in her interactions with [her paternal grandparents], and [K.A.M.] seem[ed] to be adjusting well with them.” On August 31, 1999, a judgment was signed relieving the *209 State of its custody obligation and ordering that the legal care, custody, and control and the physical custody of K.A.M. be granted to her paternal grandparents. The judgment also provided that the foster parents would be granted no visitation rights with the child.
Assigning error to the trial court’s change of custody, its denial of visitation rights to the foster parents, and its denial of the foster parents’ request to be present and to be heard regarding the permanent placement of K.A.M., the foster parents appealed the August 31, 1999 judgment. In an opinion rendered on March 31, 2000, this court reversed the trial court’s denial of the foster parents’ request to be present and be heard and remanded the matter for a hearing. See State ex rel. K.A.M., 99-2570 (La.App. 1 Cir. 3/31/00), 763 So.2d 695.
On July 17, 2000, the trial court conducted a hearing at which the foster parents were present and permitted to be heard in full. Following this hearing, the trial court rendered judgment affirming and readopting the stipulation entered into on May 4, 1999, maintaining K.A.M. in the custody of her paternal grandparents. The trial court further vacated the original judgment of October 7, 1997, that had adjudicated K.A.M. as a child in need of care. A judgment was signed in accordance with the court’s findings on August 9, 2000. It is from this judgment that the foster parents have appealed.
I ¿DISCUSSION
A. THE COURT FAILED TO FOLLOW THE LOUISIANA CHILDREN’S CODE IN CONDUCTING A PERMANENCY HEARING, USED IMPROPER STANDARDS, AND ERRED IN FAILING TO CONSIDER THE 3/25/99 CASE PLAN SUBMITTED FROM OCS.
In their first assignment of error, the foster parents place much emphasis on the fact that the March 25, 1999 OCS case plan was not considered by the trial court at the July 17, 2000 hearing. The foster parents further assert that the trial court did not conduct the hearing in accordance with the principles outlined in the Louisiana Children’s Code, namely Article 702. We find no merit to these arguments.
Pursuant to La. Ch.C. art. 674, “[cjopies of the case plan shall be filed with the court ten days before any scheduled disposition, permanency, or case review hearing.” Further, with regard to the review of case plans, La. Ch.C. art. 677 provides, in pertinent part, as follows:
A. At the disposition hearing, the court shall consider the content or implementation of the case plan and any response filed concerning it. At any other hearing held subsequent to the filing of the case plan, on its own motion or upon motion of any party for good cause shown, the court may consider the content or implementation of the case plan or of any response filed concerning it.
According to the record from the original appeal in the instant cáse, the March 25,1999 case plan was filed into the record at the May 4, 1999 review hearing. At the end of the review hearing, the assistant district attorney indicated his intent to “submit and file the court report and the case plan.” While the case plan was not actually filed into evidence as an exhibit, there is a copy of the court report and case plan along with a cover letter to the trial court dated April 5, 1999. These documents appear in the record with a “FILED” stamp dated May 4, 1999. Thus, although it is clear that the case plan was made a part of the record at the time of the hearing, it is unclear from the record if the case plan was filed with the *210 court ten days prior to the hearing as is required by Article 674. Nonetheless, because of our ultimate conclusion on the issue, we find this irregularity to be inconsequential.
When the issue of the March 25, 1999 case plan arose at the July 17, 2000 hearing, the trial court indicated that he did not believe that the case plan was part of the |Brecord from the May 4, 1999 hearing. The trial court further stated that there had been no recommendation by OCS that there be a termination of parental rights as to KA.M.’s parents. However, the trial court did allow counsel for the foster parents to proffer evidence regarding the March 25,1999 case plan.
Janice Harris, a foster care worker with OCS, testified at the July 17, 2000 hearing regarding her involvement with K.A.M.’s case. According to Ms. Harris, at the time of the May 4, 1999 hearing, the case plan for K.A.M. was termination of parental rights and adoption. Ms. Harris indicated that OCS was hopeful that the court would approve the case plan. When asked if she knew why the case plan was never submitted to the court, Ms. Harris responded, “When they went into chambers, I think something else had come up. It was changed.”[2] Ms. Harris stated that at the time of the review hearing, she was not aware that K.A.M.’s father had acknowledged paternity by notarial act. When asked if her recommendation would have been different had she known about the act of paternity, Ms. Harris responded, “Yes, it would have made a difference. Definitely.” She further indicated that “at any given time [OCS] could have had the case plan amended.” According to Ms. Harris, other than the March 25, 1999 case plan, OCS had not taken any affirmative steps toward terminating parental rights in this case. However, had a petition to terminate parental rights been filed and the formal adoption process begun, Ms. Harris indicated that K.A.M.’s paternal grandparents would have been considered along with the foster parents as possible adoptive parents.
Considering the evidence in the record and the testimony offered by Ms. Harris, it is clear that the March 25, 1999 case plan prepared by OCS was based on incomplete information. At the time of the hearing on July 17, 2000, the trial court was fully aware of the procedural history of this case and what had transpired at the previous May 4, 1999 review hearing. The trial court knew that K.A.M. had been in the custody of her paternal grandparents since August 6, 1999, and had daily contact with her biological parents as |fiwell as other blood relatives.[3] Although neither of K.A.M.’s parents was in a position at that point in time to assume custody, K.A.M.’s paternal grandparents had come forward and expressed their willingness and desire to care for their granddaughter. K.A.M.’s paternity had been confirmed, and OCS had recommended that custody be placed with the paternal grandparents. The circumstances had clearly changed since the March 25, 1999 case plan was offered by OCS recommending termination of parental rights and adoption. Thus, we find no error by the trial court in not considering the March 25,1999 case plan.
*211 With regard to permanency hearings[4] in children in need of care proceedings, La. Ch.C. art. 702 provides as follows:
A. The court shall conduct a permanency hearing within thirty days of a judicial determination pursuant to Article 672.1 that reunification efforts are not required.
B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court’s own motion.
C. In the discretion of the court, permanency hearings need not be conducted for a child who the court has determined should remain permanently in foster care with a specific foster family or for a child who has been placed in an adoptive home. However, the court shall conduct a permanency hearing within three months of any change in such a placement.
D. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1)Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and |7making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian.
(4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.
(5) Placement in the least restrictive, most family-like alternative permanent living arrangement.
E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan. The child’s health and safety shall be the paramount concern in the court’s determination of the permanent plan.
F. If a child is in an out-of-state placement, the court shall determine and enter findings on whether the placement is safe, appropriate, and otherwise in the best interests of the child.
G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions *212 that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court shall advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.
H. The permanency hearing may be conducted by a court-appointed or court-approved administrative body.
On appeal, the foster parents assert that pursuant to Article 702, adoption was a “higher priority” than placement with a family member. Thus, they argue the trial court should have considered the viability of adoption rather than simply trying to place the child with a “blood relative.” Based on the facts and circumstances of this case, we disagree with this argument.
After receiving evidence at the July 17, 2000 hearing, the trial court entertained argument by all counsel present at the hearing. Sherry Crain, counsel for OCS, analyzed the priorities for placement pursuant to Article 702. Ms. Crain indicated that while it seemed as though K.A.M.’s parents had made “sufficient progress,” OCS could not recommend return of custody to the parents because the information received in court 1 shad not been independently verified. Moving on to the next placement plan, Ms. Crain addressed the possibility of adoption. The following colloquy occurred between the court and Ms. Crain:
BY MS. CRAIN: The next option is adoption. The concerns are though when the agency staffed this case in March of 1999 we felt as an agency, and it was a team decision, that grounds may exist at that time to file a termination of parental rights. That was before [K.A.M.’s father] stepped forward to sign an act of acknowledgment and proceeded to have DNA testing as recommended in his ease plan.
BY THE COURT: And according to Ms. Harris’ testimony that new information surfacing would have changed the case plan and adoption would have been taken off the table for discussion even at that time according to what your representative said on the witness stand; is that right?
BY MS. CRAIN: Right. I’m trying to put the time line that we made this decision in March and the act of acknowledgment was presented to us in May and then he submitted to the DNA testing.
BY THE COURT: So had we had a hearing on May 6 of ’99 with that knowledge at that point, then that plan would not have been submitted to the Court that would have involved adoption or termination of parental rights because we’ve had parents and relatives that have come forward. That’s how I understood Ms. Harris’ testimony.
BY MS. CRAIN: Part of [the father’s] case plan would have been we seek out relatives. [The mother] did not have any relatives. [The father] being that he was in limbo as to whether or not he was the father we did not seek out relatives at that time for [him]. So once it became clear that he’s stepping up to the plate, though it was two years late, this relative came forward and that’s where we are at. So, Your Honor, the third option is placement with a legal guardian. And it would be my opinion that guardianship and custody be given to the grandparents.
With this recommendation from counsel for OCS, the trial court granted custody to *213 K.A.M.’s paternal grandparents. We recognize that Article 702 lists adoption ahead of placement with a legal guardian or placement in the legal custody of a relative. However, as reported by Ms. Crain and Ms. Harris, the March 25, 1999 case plan recommending termination of parental rights and adoption was based on the situation as it existed when OCS initially staffed the case. When [K.A.M.’s father] came forward, acknowledged paternity, and ultimately submitted to DNA testing confirming paternity, OCS redirected its efforts to placing K.A.M. with relatives. Further, there had been no affirmative steps taken to terminate the parental rights of [K.A.M.’s parents]. While K.A.M. was not in her parents’ custody, they were working toward reunification and were visiting with KA.M. as 18often as possible. Quite simply, adoption was no longer a viable option, as acknowledged by Ms. Crain in her argument to the court. Considering the unique posture of this case, the trial court did not err by not considering adoption as a placement plan for K.A.M.
B. THE STATE AND THE COURT VIOLATED STATE AND FEDERAL LAW BY FAILING TO CONDUCT THE PERMANENCY HEARING AT AN EARLIER DATE AND BY FAILING TO INSTITUTE TERMINATION OF PARENTAL RIGHTS PROCEDURES.
In this assignment of error, the foster parents argue that because K.A.M. had been in the State’s custody for “twenty-eight of the last twenty-eight months” at the time of the May hearing, termination of parental rights proceedings should have been instituted in accordance with Article 702. They further assert that the trial court failed to adhere to state and federal law by not conducting a timely permanency hearing.
Article 702 provides that permanency hearings shall be conducted “within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal.” La. Ch.C. art. 702(B). There is a further requirement that those permanency hearings be held at least every twelve months until the child is permanently placed. Id.
According to the record in the instant case, there was a review hearing on April 6, 1998, well within the time limitations set forth in Article 702.[5] There was a second review hearing on May 4, 1999, and then subsequent hearings as scheduled by the court due to the unusual circumstances of this case. Based on our review of the record, we find no “disregard for the law” by the State or the trial court as argued by the foster parents on appeal. The argument concerning this issue lacks merit.
The second issue addressed in this assignment of error is similarly without merit. In arguing that a termination of parental rights proceeding should have been instituted by |inthe State, the foster parents cite the following comment to Article 702: “Termination of parental rights proceedings must be initiated for any child who has been in care for fifteen of the last twenty-two months[.]” However, the foster parents fail to address the following language found in the same comment: “[T]he state has discretion not to file a petition to terminate parental rights if the *214 child is being cared for by a relative; there is a documented, compelling reason why filing would not be in the child’s best interest; or, the state has not provided services reasonably necessary for the safe return of the child to his parents’ home.” See La. Ch.C. art. 702, Comments — 1999, Comment (c).
The comment to Article 702 that the foster parents now rely on to assert that termination of parental rights proceedings should have been instituted was not a part of Article 702 at the point in time when the suggested deadlines would have passed in this case. Article 702 was amended by 1999 La. Acts No. 449, § 1, effective July 1, 1999, in order to comply with 42 U.S.C. § 601 et seq., the Adoption and Safe Families Act of 1997. Thus, in May of 1999, when this case came up for a review hearing, there was no such language in the comments to Article 702.
Nonetheless, even if we were to consider the comment to Article 702, our decision would remain the same. Clearly, the State has discretion not to file a petition to terminate parental rights if there is a “compelling reason why filing would not be in the child’s best interest.” As previously indicated, although OCS may have been on the verge of preparing to file for termination of parental rights prior to the May 4, 1999 hearing, this position changed once [KA.M.’s relatives] came forth. Thus, the State, in its discretion, chose not to pursue termination in this case. We find no error in this regard.
C. THE COURT ERRED IN GRANTING THE LEGAL CARE, CUSTODY AND CONTROL OF THE MINOR CHILD TO THE PATERNAL GRANDPARENTS.
In their final assignment of error, the foster parents assign error to the trial court’s decision to grant custody of K.A.M. to her paternal grandparents. The standard of review to be employed in cases involving the custody of children was recently set forth by this court in State ex rel. AR, 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073, as follows:
Inin cases involving the custody of children, the trial court is vested with a vast amount of discretion. Bagents v. Bagents, 419 So.2d 460, 462 (La.1982). The trial court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. In re State Ex. Rel. Thaxton, 220 So.2d 184, 187 (La.App. 1 Cir.1969). As an appellate court, we must afford great deference to the trial court’s decision, not only because of that court’s better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973). Thus, the trial court’s decision will not be disturbed on review except in the clearest case of abuse of the trial court’s great discretion. Bagents, supra.
State ex rel. AR, 99-0813 at 8, 754 So.2d at 1077-78.
After hearing evidence on July 17, 2000, the trial court gave oral reasons for judgment as follows:
Now, trying ... to put what I heard today in context with what I would have heard in May of 1999 had it taken place, the only difference I can discern between what I would have heard in May of ’99 and what I heard today is that we would not have had any of the testimony concerning how the child has flourished in the care of the relatives. And I think, given the testimony today and taking that testimony in May of 1999, that this [CJourt would have taken the same ac *215 tion and this Court would have placed the child with the relatives finding that is in the best interest of the child. And if there had been an objection to that or the [foster parents] had been here for the hearing, I would have ordered continuing home studies and follow-ups by [OCS] to make sure that what this Court had done was the right thing.... So trying to go back in time I still cannot see that had the [foster parents] been in Court in May and offered the same testimony then that they offer today that the outcome would have been any different. This child has the opportunity first of all to be with the grandparents as blood relatives, secondly, to be with a sibling, thirdly to be in a position to see the natural and biological parents on a regular basis, and fourth, be in a position to be with, visit with, play with her cousins. All of these things considered, I don’t think that there is any way this Court could have, at that time at least, made a specific finding that placement with [the paternal grandparents] would not be in the best interest of the child. And it would have been very difficult for this Court to have been able to give specific written reasons for that type of finding.
So based on what I’ve heard today and trying to relate that back to May and what I would have heard in May, this is the ruling of the Court. The stipulation entered into on May [4] is affirmed and readopted by the Court. The judgment entered into or rendered on August 6, 1999 and read and signed on August 31, 1999 is reaffirmed and readopted. Finally, having listened to the testimony today and the Court being mindful of how the child has flourished in the care of [her paternal grandparents], and the Court being mindful that [K.A.M.’s paternal grandparents] are in a position where they can take care of the child adequately, both financially and otherwise, and the Court attaches no significance to age in this instance, young parents, middle age parents, old parents; everyone does the best job that they can do under the circumstances and age is not really a factor. It depends on the people and it depends on the kind of job that they’ve done and I’ve got to credit [K.A.M.’s paternal grandparents] with doing an | ^outstanding job with this child and the other children in their household. And by saying this, this is not to belittle the efforts of [the foster parents] because I’ve said before for the record that I think [they] are good people. I think they’re good parents. But they are not favored in this instance.
[[Image here]]
The original judgment in this case was dated October 7,1997 and that judgment adjudicated [K.A.M.] a child in need of care and that she be maintained in the custody of the State .... That judgment is hereby vacated and the State of Louisiana is now removed from this proceeding. The Court finding that [K.A.M.] is no longer a child in need of services or in need of care.
And in connection with the regular civil jurisdiction of this Court, the child is continued in the custody of [her paternal grandparents] under the same conditions and circumstances existing before; that this child will not, under any circumstances, go in and remain overnight in the home of [her parents] during the period of time that they remain unmarried.
We have thoroughly reviewed the record in this case and are of the opinion that the trial court’s decision to grant custody of K.A.M. to her paternal grandparents was supported by the evidence and clearly within the court’s vast discretion. Thus, *216 the judgment below will not be disturbed by this court.
CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed in all respects. All costs associated with this appeal are assessed against the foster parents.
AFFIRMED.

. Ms. Harris was apparently referring to the May 4, 1999 conference in chambers between the court and all interested counsel wherein the parties agreed that custody of K.A.M. would be maintained with the State with the physical care and control of the child being placed with K.A.M.’s paternal grandparents.

. According to the record, K.A.M.'s parents live across the street from the paternal grandparents.

. Prior to the enactment of 1999 La. Acts No. 449, § 1, which became effective July 1, 1999, these hearings were called “dispositional review” hearings. The formerly labeled "dispo-sitional review” hearing is the equivalent of what federal statutes and regulations refer to as a "permanency” hearing. Thus, for the sake of uniformity, the name used for these hearings was changed. Permanency hearings are intended to provide for judicial review and oversight of department planning and decision making on behalf of children who have been removed form their parents' custody. See La. Ch.C. art. 702, Comments — 1999, Comment (a).

. Again, we are mindful that Article 702 was amended effective July 1, 1999, after the dates of the hearings in this case, to change the name of these hearings from "dispositional review” hearings to "permanency” hearings. However, the substantive language setting forth the time limitations remained unchanged.