851 So.2d 55 (2002)
Ex parte W.T.M.
(In re The matter of A.M.A., a minor).
W.T.M.
v.
S.P.
V.T. and E.T.
v.
S.P.
2001065, 2001064, and 2001069.
Court of Civil Appeals of Alabama.
May 17, 2002.
Rehearing Applications Denied September 13, 2002.
Certiorari Denied December 13, 2002.
*56 Kathryn L. "Sunny" Lippert, Birmingham, for W.T.M.
Joe Morgan III, Birmingham, for V.T.
Douglas Rogers, Birmingham, for S.P.
Ginette A. Dow, Bessemer, guardian ad litem.
Alabama Supreme Court 1012370.
CRAWLEY, Judge.
The appeals in this case represent the third appeal of a judgment awarding physical custody of A.M.A., a dependent child now five and one-half years old, to her foster mother, S.P. See W.T.M. v. Department of Human Res., 736 So.2d 1120 (Ala. Civ.App.1999) ("W.T.M.I"); W.T.M. v. S.P., 802 So.2d 1091 (Ala.Civ.App.2001) ("W.T.M.II"). The father has also petitioned for a writ of mandamus directing the juvenile court to award custody to the paternal aunt and uncle. The facts and procedural history were set out in W.T.M. II as follows:
"The parents of A.M.A. are not, and have never been, married to each other. In 1997, [the Department of Human Resources (`DHR')] filed a dependency petition, alleging that A.M.A., who was then an infant, was dependent because, it said, she had been born a `crack baby' and her mother, it claimed, was using cocaine and not providing adequate care for her. DHR obtained protective custody of A.M.A., and the child was placed in foster care.
"In February 1998, W.T.M., who had established a relationship with A.M.A. at birth, was judicially determined to be her father. In March 1998, W.T.M., along with his sister S.B., petitioned for joint custody of the child, alleging that W.T.M. had suffered a disabling stroke and was unable to care for the child without help. After a dispositional hearing in August 1998, the juvenile court ordered that the child remain in the custody of DHR, with foster-care placement. W.T.M. and S.B. appealed that order to this court, but the appeal was dismissed as untimely. See W.T.M. v. Department of Human Res., 736 So.2d 1120 (Ala.Civ.App.1999).
"In May 1999, V.T., another sister of W.T.M. and the child's paternal aunt, moved to intervene and, along with her husband, petitioned for custody of A.M.A. In June 1999, S.P., the child's foster mother, also moved to intervene and sought custody. The juvenile court granted both motions to intervene and, following a dispositional hearing, awarded custody to S.P. and granted specific *57 rights of visitation to the father as well as to V.T. and her husband.
"The judgment states, in part:
"`After reviewing the law submitted by counsel for the parties, and hearing argument regarding the burden of proof required in this cause, this Court finds that said Petitions filed by child's Paternal Aunt and Uncle, and by child's Foster Parent should be considered as Petitions to Modify the child custody Order issued by this Court on August 7, 1998, granting custody of said child to [DHR]. In modification proceedings, the standard of proof is set out in [Ex parte McLendon, 455 So.2d 863 (Ala.1984)], whether a change in custody would materially promote the welfare of the child. The reason for this stricter standard is that uprooting children and moving them can be very traumatic.
"`This Court finds that there have been no substantial changes in circumstances as presented by the paternal Aunt and Uncle that would materially promote the welfare of the child by changing custody from the Foster Parent to the Paternal Aunt and Uncle. This Court notes that said child has been in the custody of her Foster Parent during the past 2½ years where according to DHR reports said Foster Parent has provided child with a loving, nurturing environment and excellent care. Due to the fact that said child was found dependent by this Court on September 23, [1997], pursuant to Title 12-15-71(a)(3)(c), Alabama Code 1975, a child found dependent may be awarded to a relative or other individual who, after study by [DHR], is found by the Court to be qualified to receive and care for the child. Therefore, the care, custody, and control of said minor child ... is hereby awarded to her Foster Parent [S.P.], with whom [DHR] placed said minor child approximately 2½ years ago.'"
802 So.2d at 1092-93. In W.T.M. II, this court held:
"[T]he trial court applied the McLendon standard, which was too stringent a burden of proof. Therefore, this cause must be remanded with instructions for the trial court to apply the correct standard, the `best interest' standard. See Ex parte Perkins, 646 So.2d 46 (Ala. 1994). In its determination of the child's best interest, the juvenile court should keep in mind § 12-15-62(c), Ala. Code 1975 (mandating that `[i]f a permanent plan is not presented [by DHR] to the court [within 18 months of an order placing a child in foster care] there shall be a rebuttable presumption that the child shall be returned to the family'); the decision in R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), aff'd, 145 F.3d 363 (11th Cir.1998) (stating that DHR has the affirmative duty to facilitate family reunification whenever that goal is possible); and § 12-15-1.1, Ala. Code 1975 (stating the legislative goal of family reunification in juvenile dependency cases).
"The judgment of the juvenile court is reversed, and the cause is remanded with instructions to apply the `best interest' standard to the disposition of this dependent child."
802 So.2d at 1094.
Citing Ex parte Perkins, 646 So.2d 46 (Ala.1994), this court remanded the cause to the juvenile court to apply the "best-interest" standard. The rule of Perkins is that when the trial court uses an improper, higher standard to deny relief to a party requesting a modification of a prior custody order, the appellate court will not *58 review the evidence under the correct lower standard and direct the award of custody. Instead, the appellate reverses the judgment and remands the cause for the trial court to make a custody determination, applying the correct standard. Ex parte Perkins, 646 So.2d at 46-47.[1]
On remand in this case, the juvenile court entered the following order:
"In accordance with an Order issued by the Alabama Court of Civil Appeals,... instructing this Court to apply the `best interest' standard in this dispositional hearing of a dependent child, this Court finds that it is in the best interest of said minor child that her custody remain with [S.P., the foster mother] who has had physical custody of said minor child for the past 3½ years and has provided said child with a loving and nurturing environment, and excellent care. Child's Paternal Aunt and Uncle shall have the standard rights of visitation with said minor child as previously Ordered by this Court on March 7, 2000."
From the juvenile court's order on remand, the father (case no. 2001064) and the paternal aunt and her husband (case no. 2001069) appealed to this court. The father also petitioned for a writ of mandamus, directing the juvenile court to award custody to the paternal aunt and uncle (case no. 2001065). We hold that the juvenile court erred by determining that it was in A.M.A.'s best interest to be placed in the custody of her foster mother, S.P.
The juvenile court's factual findingsthat S.P. had had physical custody of the child for 3½ years, that S.P. had provided the child with a loving and nurturing environment, and that S.P. had given the child excellent careare fully supported by the record. However, those factual findings are insufficient, as a matter of law, to overcome the statutory policies and preferences expressed in § 12-15-1.1 and § 12-15-62(c), Ala.Code 1975.
Section 12-15-1.1 states, as a legislative goal for the juvenile court, that the court should "preserve and strengthen the child's family whenever possible" and should maintain "a preference at all times for the preservation of the family." See § 12-15-1.1(1) and (8). Section 12-15-62(c) states a preference for placing a dependent child who has been in long-term foster care with a relative over an unrelated caregiver.
Judge Murdock's dissenting opinion cites our decision in W.T. v. State Department of Human Resources, 707 So.2d 647, 651 (Ala.Civ.App.1997), for the proposition that § 12-15-71 gives the juvenile court "`the broadest possible range of placement options in the dispositional phase of a dependency proceeding.'" 851 So.2d at 67. It is true that, based on the law as it existed when W.T. was decided, the juvenile court was not required to give priority to placing a dependent child with a relative over an unrelated caregiver. After our decision in W.T., however, the Alabama statutes relating to the disposition of dependent children (§§ 12-15-62 and 12-15-65) *59 were amended, effective April 22, 1998, to comply with two pieces of congressional legislation, namely: (1) the Adoption and Safe Families Act of 1997, Pub.L. No. 105-89, 111 Stat. 2115 (1997) ("the ASFA") (codified at 42 U.S.C. §§ 671 and 675) and (2) the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. 104-193, § 505(3), 110 Stat., 2104 (August 22, 1996), now codified, in relevant part, at 42 U.S.C. § 671(a).
Most of the Alabama amendments appear at § 12-15-62(c) and § 12-15-65(a), (m), and (n). The 1998 amendments added three sentences to subsection (c) of § 12-15-62, the first two of which are pertinent here:
"The purpose of the permanency hearing shall be to determine the permanency plan for the child which may include whether, and, if applicable, when, the child shall be (i) returned to the parent, (ii) placed for adoption wherein the Department of Human Resources shall file a petition for termination of parental rights, or (iii) referred for legal custody. The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian."
(Emphasis added.) In W.T., we held that § 12-15-71 stated no preference for placing a dependent child with a parent, family member, or other relative. After the 1998 amendments to § 12-15-62(c), however, the "relative preference" does, as Judge Murdock's dissenting opinion suggests, "override[] the Legislature's express grant of broad discretion to the trial court in § 12-15-71(a)." 851 So.2d at 66.
The preference for placement of a dependent child with a "fit and willing relative" is derived from 42 U.S.C. § 671(a). That section sets forth the requirements for states to obtain federal appropriations for "foster care and transitional independent living programs for children." Subsection (19) of § 671(a) states:
"In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary [of Health & Human Services] which
"....
"(19) provides that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a [dependent] child, provided that the relative caregiver meets all relevant State child protection standards."
Other jurisdictions have recognized that, in their state statutes concerning permanency hearings for dependent children, there is a "relative-placement preference" corresponding to federal legislation. See, e.g., State ex rel. V.F.R., 815 So.2d 1035 (La.Ct. App.2002); State ex rel. K.A.M., 809 So.2d 206 (La.Ct.App.2001); Marylou L. v. Tenecha L., 182 Misc.2d 457, 458, 698 N.Y.S.2d 827, 829 (1999); In re L.S. and K.S., 172 Vt. 549, 549, 772 A.2d 1077, 1078 (2001).
In passing the ASFA, Congress emphasized two themes: that the primary goal of the child welfare system is to secure the safety of children who enter the system and that children should not languish for extended periods in foster care without a plan for their timely permanent placement. See, e.g., David J. Herring, The Adoption and Safe Families ActHope and its Subversion, 34 Fam. L.Q. 329, 329 (2000); Ernestine Steward Gray, The Adoption and Safe Families Act of 1997: Confronting *60 an American Tragedy, 46 La. B.J. 477, 478 (April 1999).
"ASFA introduces rather specific procedural measures and time lines designed to achieve timely permanent placements. First, ASFA requires a judicial hearing twelve months after the date on which the child entered foster care. This hearing is no longer labeled the `dispositional hearing,' but is now termed the `permanency hearing.' At this hearing, the judge is to determine whether the child will be returned to his or her parents, placed for adoption (following the termination of parental rights), referred for legal guardianship, or placed in another planned permanent living arrangement. ASFA allows the judge to order the latter permanency outcome only if the agency has documented compelling reasons as to why the other permanent outcomes would not be in the child's best interests."
Herring, 34 Fam. L.Q. at 338-39 (footnotes omitted).
The ASFA requires a State agency like DHR to petition for the termination of parental rights when any child has been in foster care for 15 of the last 22 months. See 42 U.S.C. § 675(5)(E). There are only three exceptions to this requirement: (1) if the child is being cared for by a relative; (2) if the State agency has documented in its case plan a compelling reason for determining that a petition to terminate parental rights is not in the best interest of the child; and (3) if the State has not provided the child's family with "such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts ... are required to be made with respect to the child." See 42 U.S.C. § 675(5)(E)(i)-(iii). See Herring, 34 Fam. L.Q. at 339-40 (stating that "[t]he agency can avoid the [termination-of-parental-rights-and-]adoption outcome if it has placed the child with a relative or has documented a compelling reason that termination of parental rights and adoption would not be in the best interests of the child").
In the present case, DHR recommended, pursuant to § 12-15-62(c)and consistent with the mandate of 42 U.S.C. § 675(5)(E)(i)that the child be placed with V.T. and E.T., her paternal aunt and uncle. The evidence demonstrates that V.T. and E.T., the father's sister and brother-in-law, are willing and able to assume physical custody of the child, that the child has developed a relationship with them, and that they are fit and loving caregivers. The undisputed evidence indicates that the father has had a relationship with the child since her birth and that, but for the father's debilitating stroke and the resulting physical limitations, he would himself be petitioning for custody of the child. Given the father's limitations, awarding custody of the child to the paternal aunt and uncle is the nearest approximation to a real parent-child relationship possible for W.T.M. and A.M.A. The mere fact that the child has been in S.P.'s foster care for a long time is insufficient, as a matter of law, to prevail over the policies and preferences that support placing the child with her relatives.
Judge Murdock's dissenting opinion states:
"If the evidence ... was insufficient as a matter of law to rebut some presumption favoring placement with a relative or to allow the trial court to use its discretion to determine that a permanent award of custody to S.P. was in the child's best interests, we could have said so then. We did not. Instead, we remanded the case to the trial court to exercise its discretion and to determine the best interests of the child based on [the] record. The trial court did that." *61 851 So.2d at 69-70. In W.T.M. II, we did not state that the evidence was insufficient as a matter of law to support the trial court's judgment awarding custody to the foster mother; the trial court's judgment was based on an incorrect standard and it was necessary to remand the case to the trial court with directions that it (1) conduct another review of the record applying the correct standard and then (2) redetermine the custody award. This court had no authority to redetermine custody. See Ex parte Perkins, supra. On return to remand, we could affirm the court's redetermination of custody if that redetermination was supported by additional factual findings (based on the original record) indicating that the paternal aunt and uncle were either unfit or unwilling to have custody of the child. Here, the trial court made factual findings that were insufficient as a matter of law. Because of our disposition of the appeal, the father's petition for the writ of mandamus is denied as moot.
The judgment of the juvenile court is reversed.
2001064 and 2001069REVERSED.
2001065PETITION DENIED.
PITTMAN, J., concurs.
YATES, P.J., and THOMPSON, J., concur in the result.
MURDOCK, J., dissents.
MURDOCK, Judge, dissenting.
The lead opinion in the second appeal of this case, W.T.M. v. S.P., 802 So.2d 1091 (Ala.Civ.App.2001) ("W.T.M.II"), concluded that the judgment of the trial court was the result of a dispositional hearing in a dependency proceeding, not a change of custody under Ex parte McLendon, 455 So.2d 863 (Ala.1984). It therefore reasoned that the "material-promotion" standard of McLendon did not apply and that, as a result, the case should be remanded for the trial court to determine custody upon application of a "best-interests" standard. After reviewing the record and the trial court's judgment on remand, I see no basis for concluding that the trial court did not follow the mandate of this court and the concomitant law of this case.[2]
The record in this case reveals that the child, A.M.A., was born in September 1996. When A.M.A. was seven months old, DHR obtained protective custody of her. In June 1997, when A.M.A. was nine months old, S.P. became her foster mother. A.M.A. was approximately three and one-half years of age at the time of the March 2000 judgment at issue here. Of that three and one-half years, she had lived with S.P. almost three years. By the time the trial court issued its judgment on remand on June 22, 2001, based upon the "best-interests" standard that we mandated in W.T.M. II, A.M.A. was almost five years old and had lived with S.P. for approximately four years immediately preceding that judgment.
It was undisputed that S.P.'s home was suitable for A.M.A. and that S.P. and A.M.A. had a very close and loving relationship. Even V.T., A.M.A.'s paternal aunt, admitted that S.P. had "done a pretty good job of raising" the child and that the child was well-adjusted, outgoing, and vivacious. The record reflects that S.P. was 41 years old and had three other foster children (two boys and one girl, ages 8, 7, and 5, respectively), all of whom she had had custody of for over four years and *62 was attempting to adopt. A representative of DHR testified that the four children, who had grown up together, were "very, very bonded.... They're extremely close. The two boys ... that's their sister and [A.M.A.] thinks of [the other foster children] as those are my brothers and [sister]."
The record reflects that S.P. and the children regularly attended church together and that the children likewise participated in Sunday school and in a missions program held at the church on Wednesday nights. S.P.'s sister, who lives in Georgia, testified that she and her three children visited S.P. "every two or three months," that the sister's family and S.P. and the four children S.P. cared for had spent Thanksgiving together each of the last three or four years and that the families had spent Christmas together along with S.P.'s mother and another sister. The record also reflects that S.P.'s mother regularly assisted S.P. in caring for the four children and that A.M.A. had formed a positive relationship with S.P.'s extended family.
S.P. testified that, although she had filed for a divorce from her husband, she could provide for all of the children financially; it was undisputed that the child had been well cared for physically, as well as emotionally. S.P. further testified:
"Q: And what was the reason that you filedor asked to intervene in this case and filed for custody?
"A: I have just felt like in this amount of time it was not in her best interest to be placed. And [the DHR worker] had told me before that she had talked to [V.T.] and that she said she didn't want any more children. And I in my mind started thinking that everybody was doing this together and that it really wasn't for the best interest of her.
"Q: And, so, you have bonded with her as your child?
"A: Yes, I have.
"Q: And you don't have any kind of ulterior motive or other motive other than the care of the child do you?
"A: No.
"....
"Q: And the only reason that you're in court today is that you think that it is in [the child's] best interest that she stay where she is?
"A: I think at this point in her age and as long as she's been where she is, it's in her best interest to stay where she's at."
At the time of trial, V.T. and her husband, E.T., were both 54 years of age. Although DHR had approved of V.T. for placement of the child, the record reflects that V.T. and E.T. had not attempted to obtain custody in 1998.[3] Further, the record reflects that E.T. had been arrested twiceonce in March 1997 and again in September 1997for driving under the influence of alcohol, although he had not been convicted of either offense. E.T. admitted that he had continued to drive home on occasion after he had "had two or three beers at the Stadium Grill.... I mean, it's kind of hard to stop at Applebee's or wherever and not drive to get home whether you have one or twenty."
A representative of DHR testified that, although DHR's policy was to seek a relative for placement when an appropriate relative could be located, in the representative's five and one-half years of experience with DHR she had never known DHR to remove a child from a home after *63 the child had been placed in the home as an infant and had remained in the home for three years.
A.M.A. is now five and one-half years old. Every witness testified that the child is a happy, loving child. The trial court, in its discretion, awarded custody of A.M.A. to S.P., who has had physical custody of the child since she was an infant and who has provided the only home, and in a real sense, has been the only mother, the child has ever known.
Because the lead opinion in W.T.M. II considered this case to involve a dependency proceeding, our mandate that the trial court apply a "best-interests" standard on remand was consistent with Ala.Code 1975, § 12-15-71(a). That statute provides, in pertinent part:
"If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:

"(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
"(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources.
"(3) Transfer legal custody to any of the following:
"a. The Department of Human Resources; provided, that the department is equipped to care for the child.
"b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
"c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.

"(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child."

(Emphasis added.)
Consistent with § 12-15-71(a), we have long stated in both child custody and dependency cases, that the primary concern is the best interests and welfare of the child. E.g., McKinney v. Alabama Dep't of Pensions & Sec., 475 So.2d 568 (Ala.Civ. App.1985); Melton v. State Dep't of Pensions & Sec., 448 So.2d 392 (Ala.Civ.App. 1984); Price v. Price, 440 So.2d 1110 (Ala. Civ.App.1983). Even our law's recognition of a presumption of custody in favor of a natural parent finds its genesis in the concern for the best interests of the child:
"The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for."
Striplin v. Ware, 36 Ala. 87, 89 (1860) (quoted with approval in Ex parte D.J., 645 So.2d 303 (Ala.1994)). See also Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983) ("The prima facie right of a natural parent to the custody of his ... child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right ... is in the best interest and welfare of the child as a matter of law.").
*64 Obviously, it is quite relevant to a determination of a child's best interests and welfare "to consider ties of affection resulting from years of association between the child and its custodian." Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (1975) (custody determination in a divorce case). In Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973), this court explained:
"To tear [a child] from his home and those he knows as his parents and the source of love, safety and security merely to give sanction to a principle of priority of right is unconscionable. The principle of priority of right of a parent to custody is founded upon the premise that because of a blood relation and instinct, such parent will better love and care for a child than one not so related. Such premise may be theoretically correct but practical experience has often proved it incorrect. The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living. Out of the actual relationship of parent and child love grows. It is not merely a product of the biological function of conception and giving birth. To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child."
49 Ala.App. at 661-662, 275 So.2d at 341. See generally Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
It would appear not only that the trial court acted consistently with this court's mandate that it apply a "best-interests" standard, but that it did so entirely consistently with § 12-15-71(a) and the policy concerns explained in Striplin, Mathews, Borsdorf, and the other cases cited above. The lead opinion in W.T.M. II was a plurality opinion. It stated:
"In its determination of the child's best interest, the juvenile court should keep in mind § 12-15-62(c), Ala.Code 1975 (mandating that `[i]f a permanent plan is not presented [by DHR] to the court [within 18 months of an order placing a child in foster care] there shall be a rebuttable presumption that the child shall be returned to the family'); the decision in R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), aff'd, 145 F.3d 363 (11th Cir.1998) (stating that DHR has the affirmative duty to facilitate family reunification whenever that goal is possible); and § 12-15-1.1, Ala. Code 1975 (stating the legislative goal of family reunification in juvenile dependency cases)."
802 So.2d at 1094. As with the trial court's application of the mandated "best-interest" standard, I see no reason to conclude that the trial court did not "keep in mind" the foregoing items. None of these items individually, or collectively, foreclosed the trial court from reaching the judgment that it reached.
The first of the three items the lead opinion in W.T.M. II stated that the trial court "should keep in mind" is § 12-15-62(c), which provides, in pertinent part:
"Within 12 months of any court order placing a child in foster care the court shall hold a permanency hearing. [DHR] shall present to the court at such hearing a permanent plan for said child. If a permanent plan is not presented to the court at this hearing there shall be a rebuttable presumption that the child should be returned to the family. This provision is intended to insure that a permanent plan is prepared by [DHR] and presented to the court within 12 months of the placement of any child in foster care. The purpose of the permanency *65 hearing shall be to determine the permanency plan for the child which may include whether, and, if applicable, when, the child shall be (i) returned to the parent, (ii) placed for adoption wherein [DHR] shall file a petition for termination of parental rights, or (iii) referred for legal custody. The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian."
(Emphasis added.)[4]
In the present case, the trial court placed A.M.A. in the temporary custody of DHR on March 21, 1997. The trial court's orders from hearings on May 1, 1997, September 23, 1997, and November 6, 1997, all stated that the trial court concurred with the "plan for the child," which appeared to be to return the child to the mother, if possible. The trial court held a permanency hearing for the child on February 18, 1998, less than 12 months after DHR had assumed custody. In the trial court's order dated February 19, 1998, the court stated that it concurred with the plan for the child and that the "permanent plan" for the child was reunification with relatives.[5] Based upon the foregoing, the trial court's handling of this case has been consistent with § 12-15-62(c).[6]
Moreover, I note that § 12-15-62(c) creates a rebuttable presumption, not a conclusive presumption. Even if DHR had not presented a permanent plan to the trial court within 12 months, under the facts of this case substantial evidence supports the trial court's conclusion that the presumption was rebutted.
*66 Finally, even if a timely permanency hearing had not been held, and even if the evidence had not been sufficient to support a judgment that the presumption of § 12-15-62(c) was rebutted, that presumption is that the child should be "returned to the family." Even if § 12-15-62(c) somehow overrides the Legislature's express grant of broad discretion to the trial court in § 12-15-71(a) and required the trial court in this case to order that the child be "returned to the family," that is not possible in this case in the manner contemplated. The child was in her mother's custody until March 1997, when DHR obtained temporary custody and placed the child with foster parents. In June 1997, DHR removed the child from those foster parents and placed her in the care of S.P.; the child has remained in S.P.'s care since that time. Neither the father nor any other "family" member other than the mother has ever had custody of the child, except for limited visitation in accordance with the trial court's orders. Based upon the record, it appears that the mother has not attempted to regain custody of the child. V.T. has never had custody of the child; a "return" to V.T. is not possible.[7]
The lead opinion in W.T.M. II also stated that the trial court should consider the United States District Court's decision in R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), aff'd, 145 F.3d 363 (11th Cir.1998), and Ala.Code 1975, § 12-15-1.1, regarding the obligation to seek "family reunification" whenever that "goal" is possible.[8] I first note that family reunification is a goal, not a strict requirement. Second, as noted above, there is no "reunification" at issue here.[9]
Further, the main opinion in this case assumes that "family" as that word is used in § 12-15-62(c) and § 12-15-1.1(1) and (8), includes V.T. and E.T., a paternal aunt and uncle. The Alabama Juvenile Justice Act (Ala.Code 1975, § 12-15-1 et seq.) does not define the term "family." I am concerned about the main opinion's extension of that term to include relatives other than a child's parents, particularly when those relatives have never had custody, and the child, therefore, cannot be "returned" to them within the contemplation of the statute.
If the term "family" was not intended as a reference to an immediate family to which a child can be returned, it is not clear where the definitional line for a "family" is to be drawn. By going beyond the *67 child's parents and immediate family to draw this line, this court runs a risk of judicially defining all dependent children's best interests as placement anywhere within some extended "family tree." This is something the Legislature has not done, undoubtedly because it is something that, in many cases, will be at odds with the child's best interests.
Further, the reunification with "family" referenced in W.T.M. II in relation to § 12-15-1.1 and § 12-15-62 must be considered in light of the actual wording of those statutes. Nowhere does either statute actually call for a "reunification" with "family." Instead, § 12-15-1.1 provides, in pertinent part:
"In furtherance of [the] purpose [of this Act], the following goals have been established for the juvenile court:
"(1) To preserve and strengthen the child's family whenever possible, including improvement of home environment.
"(2) To remove the child from the custody of his or her parents only when it is judicially determined to be in his or her best interest or for the safety and protection of the public.
"(3) To reunite a child with his or her parents as quickly and as safely as possible when the child has been removed from the custody of his or her parents.

"(4) To secure for any child removed from parental custody the necessary treatment, care, guidance, and discipline to assist him or her in becoming a responsible productive member of society.
"....
"(8) To achieve the foregoing goals in the least restrictive setting necessary, with a preference at all times for the preservation of the family and the integration of parental accountability and participation in treatment and counseling programs."
(Emphasis added.) Thus, the "reunification" goal expressed in § 12-15-1.1 is actually a goal for reunification with parents, § 12-15-1.1(3), not reunification with extended family generally. Similarly, § 12-15-62(c) contains references to a child's being "returned to the parent" and "return[ed] home." Considering the usage in these statutes of the term "family," in relation to the use of the terms "home," "parents," and "parental," I do not construe the term "family" in these statutes to mean extended family, particularly extended family with whom the child has never lived.
The main opinion in the present case essentially overlays onto the provisions of § 12-15-71 a requirement that if a viable[10]relative placement is possible, the court has no choice but to favor that placement. The statute does not require this. To the contrary, as stated in the main opinion in W.T. v. State Department of Human Resources, 707 So.2d 647 (Ala.Civ.App.1997):
"The legislative intent underlying § 12-15-71 appears to be to give the juvenile court the broadest possible range of placement options in the dispositional phase of a dependency proceeding. We find no evidence that the legislature intended to accord a parent (even a noncustodial parent who may not have contributed to the child's becoming dependent) a presumption of fitness in the dispositional phase of a dependency case. The legislature is well aware of *68 how to write a `parental preference' presumption into a statute. See, e.g., § 12-15-71(a)(6) (`There shall be a rebuttable presumption that children cannot be removed from custody of parents solely because of a need for emergency housing'); § 12-15-62(c) (`If a permanent plan is not presented [by DHR] to the court [within 18 months of an order placing a child in foster care] there shall be a rebuttable presumption that the child shall be returned to the family'). The legislature could have directed the juvenile court to place a dependent child with a nonparent only if it first found the parent or parents unfit. However, `no alternative contained in [§ 12-15-71] has any priority over the other alternatives. The trial court may choose that alternative which it finds to be in the best interests of the [dependent child].' Wallace v. Pollard, 532 So.2d [632,] 633 [(Ala.Civ.App.1988)].
"We cannot conclude that the legislature's failure to incorporate the [Ex parte] Terry [,494 So.2d 628 (Ala.1986),] presumption into the statute providing for the disposition of dependent children was an oversight that may be remedied by the judicial branch. The express references to a parental preference presumption elsewhere in the statute `establish that the Legislature knew how to so limit or restrict the provisions of the statute if that was the intent.' Dannelley v. State, 397 So.2d 555, 569 (Ala. Crim.App.), cert. denied, 397 So.2d 577 (Ala.), cert. denied, 454 U.S. 856, 102 S.Ct. 305, 70 L.Ed.2d 151 (1981).
"`....'
"....
"The standard to be used in the dispositional phase of a dependency proceeding is the `best interest' of the child. `The paramount considerations [in the dispositional phase of a dependency proceeding] are the welfare and best interests of the child. The relationship of a blood relative is subsidiary to such welfare.' D.K.G. v. J.H., 627 So.2d [937,] 938 [(Ala.Civ.App.1993)].
"`Section 12-15-71(a)(5) empowers the court which has found a child to be dependent to make such orders as the court in its discretion shall deem to be for the welfare and best interests of the child. This court has interpreted that power broadly to mean that its only parameter is the best interests and welfare of the child.'
"Minchew v. Mobile County Dep't of Human Resources, 504 So.2d [310,] 311 [(Ala.Civ.App.1987)]."
707 So.2d at 651 (emphasis added).
The main opinion takes issue with the citation to W.T. in this dissent, noting that certain of our statutes relating to dependency of children were amended in 1998, after W.T. was decided. The main opinion then proceeds to discuss the portion of those amendments embodied in Ala.Code 1975, § 12-15-62(c). It is the amended version of § 12-15-62(c) that this dissenting opinion discusses at length. The main opinion, however, also quotes the following two sentences from amended § 12-15-62(c):
"`The purpose of the permanency hearing shall be to determine the permanency plan for the child which may include whether, and, if applicable, when, the child shall be (i) returned to the parent, (ii) placed for adoption wherein the Department of Human Resources shall file a petition for termination of parental rights, or (iii) referred for legal custody. The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining *69 that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian.'"

851 So.2d at 59 (emphasis added).
I note two things regarding this language. First, as previously noted, the "return" of children referenced in the provisions is a return "to the parent," and a "return home," and not a return to some more broadly defined "family." Again, this is consistent with the manner in which the terms "family," "parents," "home," and "reunite" are used in § 12-15-1.1.
Second, and more importantly, I cannot see how the quoted passage overrides the discretion given to trial courts in Ala.Code 1975, § 12-15-71, or how it grants a "preference" to relatives over other options made available to trial courts in § 12-15-71. To the contrary, the quoted passage references placement "with a fit and willing relative" in the same list of options as it does placement "with a legal custodian." Syntactically, the two are placed on par with one another; there is no express preference for one over the other.[11]
The main opinion also relies upon 42 U.S.C. §§ 671(a) and 675, part of the federal Adoption and Safe Families Act of 1997. These federal statutes do not purport to prescribe rules of decision for state courts in dependency cases. Clearly, the rules of decision in our dependency cases are stated in Alabama statutes and in our precedents.[12] Nowhere does 42 U.S.C. § 671(a) or 42 U.S.C. § 675 or any other federal statute of which I am aware, state that the courts of Alabama must always select a relative over a nonrelative in a custody determination.[13] I do not believe Congress intended to dictate to the states that they must always place a child with a nonparent relative, even when such a placement is not in the best interests of the child. I certainly find no authority requiring that a federally imposed "relative" preference must override a state court's determination of a child's best interests. It is my conclusion that the decisions of this court, and those of Alabama trial courts, remain governed by the best interests of the children, which has always been the polestar for our decisions in this area.
Nothing in the record or the trial court's judgment in this case indicates that that court did not make the mandated "best-interests" determination or that in doing so it did not "keep in mind" the rebuttable presumption of § 12-15-62(c) and the "goals" stated in R.C. and § 12-15-1.1. When we remanded this case in W.T.M. II, this court was well aware of the record before the trial court, as it was of § 12-15-62(c), the Adoption and Safe Families Act of 1997, R.C., and § 12-15-1.1. If the evidence *70 in that record was insufficient as a matter of law to rebut some presumption favoring placement with a relative or to allow the trial court to use its discretion to determine that a permanent award of custody to S.P. was in the child's best interests, we could have said so then. We did not. Instead, we remanded the case to the trial court to exercise its discretion and to determine the best interests of the child based on that record. The trial court did that.[14]
As the main opinion now notes, "[t]he juvenile court's factual findingsthat S.P. had had physical custody of the child for 3½ years, that S.P. had provided the child with a loving and nurturing environment, and that S.P. had given the child excellent careare fully supported by the record." 851 So.2d at 58. There is no indication in the record that, in making the mandated determination of best interests, the trial court did not keep in mind the other factors referenced in this court's opinion in W.T.M. II. In other words, nothing in the record indicates that the trial court did not follow this court's mandate and the law of this case.
When evidence is received ore tenus, a judgment based on findings of fact by the trial court will not be reversed unless that judgment is shown to be plainly and palpably wrong; we are not allowed to reweigh the evidence, nor may we substitute our own judgment if the trial court's judgment is supported by reasonable inferences from the evidence. Ex parte Pielach, 681 So.2d 154 (Ala.1996). This deferential standard applies to both explicit and implicit findings of fact. See Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375 (Ala.1992).
*71 As our Supreme Court recently stated in Ex parte H.H., 830 So.2d 21 (Ala.2002):
"`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'"
830 So.2d at 25 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)); see also Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) ("Only where the findings are not supported by the evidence and are clearly erroneous should an appellate court decide that the facts are not as the trial court found them to be.").
I believe that in order to reverse the judgment of the trial court, the majority must reweigh the evidence and substitute its judgment for that of the trial court. I therefore respectfully dissent from that reversal.
NOTES
[1] In Perkins, the trial court applied the standard established in Ex parte Terry, 494 So.2d 628 (Ala.1986), to deny a father's request for a custody modification. This court held that the trial court had erred by using the Terry standard when it should have used the standard established in Ex parte McLendon, 455 So.2d 863 (Ala.1984). This court then reviewed the evidence and determined that the father had met the McLendon standard; we remanded the case with directions for the trial court to award custody to the father. The Alabama Supreme Court reversed our judgment, holding that this court had no authority to direct an award of custody, but had the authority only to remand for the trial court to apply the correct standard.
[2] No petition was filed seeking certiorari review by the Supreme Court of the mandate in W.T.M. II that the trial court apply a best-interests standard. That mandate therefore is the law of this case. See, e.g., Ex parte Jones, 774 So.2d 607 (Ala.Civ.App.2000).
[3] V.T. testified that, at the time, she thought her sister would be approved for custody and that her sister would have been a better caregiver for the child at that time. See W.T.M. v. Department of Human Res., 736 So.2d 1120 (Ala.Civ.App.1999).
[4] The lead opinion in W.T.M. II actually quoted § 12-15-62(c) as it read before it was amended, effective April 22, 1998, to change the applicable period for holding the permanency hearing from 18 months to 12 months. Regardless of whether a 12-month or an 18-month period is considered, however, the trial court in this case acted in a manner consistent with § 12-15-62(c).
[5] I note that the father, whose paternity had been established in February 1998, and a sister other than V.T. filed a joint petition for custody of the child in March 1998. After questions arose as to the suitability of the sister and her husband to receive custody of the child, the trial court denied the joint petition for custody in an order dated August 7, 1998, and stated that custody of the child would remain with DHR. The father unsuccessfully appealed to this court; no petition for certiorari review was filed with the Supreme Court.
[6] The intent expressed in § 12-15-62(c) is to ensure that DHR develops and proposes a timely permanent plan for a child who is placed in foster care, not to establish a presumption that restricts the trial court's broad discretion in actually reaching a final judgment regarding that child. See Ala.Code 1975, § 12-15-62(c) ("This provision is intended to insure that a permanent plan is prepared by [DHR] and presented to the court within 12 months of the placement of any child in foster care."). In neither § 12-15-62(c) (assuming a permanent plan is presented to DHR within 12 months) nor § 12-15-71 (a) does the Legislature dictate a preference for a dependent child's placement as between a parent, other relative, or other custodian.

Further, by handling this case in a manner consistent with § 12-15-62(c), the trial court also has satisfied the policy concerns of the Adoption and Safe Families Act of 1997, 42 U.S.C. § 675(5), upon which the main opinion also seeks to rely. A permanency hearing was held within the applicable time and the child will no longer be in "foster care," but with a legal custodian the child knows as its "mother," subject to visitation rights with the father and V.T. and her husband.
[7] I further note that, in the present case, not only has the trial court deemed continued custody with S.P. to be in the best interests of the child, the court has never found V.T. to be a suitable alternative primary custodian.
[8] In R.C., the court refused DHR's request to modify or vacate a consent judgment entered in a civil action brought by a defined class of children who were in foster care or under DHR's care. R.C., supra. We are not presented in this case with the need to address the scope of the R.C. consent decree or whether A.M.A. falls within the class of children defined therein.
[9] There is no argument before us that placement with V.T. is required by the United States Constitution because it would arguably be less restrictive of the father's residual parental rights. I also note that this case does not involve a termination of the father's parental rights, but only a custody placement, and that the father, as well as V.T. and her husband, will continue to have visitation with the child under the court's order, and with the agreement of S.P.

Further, because a "permanent" placement has been made and DHR has been relieved of any further obligation to supervise the child, the main opinion's statements regarding the termination of parental rights appear to be misplaced. Because the child is no longer in foster care under the supervision of DHR, DHR no longer has an obligation to petition for termination of parental rights under Ala. Code 1975, § 26-18-5(b).
[10] The main opinion concludes that "we could affirm the [trial] court's redetermination of custody if that redetermination was supported by additional factual findings (based on the original record) indicating that the paternal aunt and uncle were either unfit or unwilling to have custody of the child." 851 So.2d at 61 (emphasis in original omitted; emphasis added).
[11] Even if a "preference" were to be given to "relatives" over all other options, this would appear to me to be the sort of casei.e., where a child has lived with a nonrelative parent figure for most of her lifewhere the fact that such a preference is only that, i.e., a preference, and not a conclusive presumption, would allow for placement with someone who is not a relative.
[12] Even if § 671(a) did purport to alter the rule of decision for state courts, it would require only that a fit and willing relative be "considered" for preference.
[13] Nor do I read the four cases from Louisiana, Vermont, and New York, cited by the majority for the proposition that "their state statutes ... [contain] a `relative-placement preference' corresponding to federal legislation," to recognize such a proposition. 851 So.2d at 59. See State ex rel. V.F.R., 815 So.2d 1035 (La.Ct.App.2002); State ex rel. K.A.M., 809 So.2d 206 (La.Ct.App.2001); Marylou L. v. Tenecha L., 182 Misc.2d 457, 458, 698 N.Y.S.2d 827, 829 (1999); In re L.S. and K.S., 172 Vt. 549, 549, 772 A.2d 1077, 1078 (2001).
[14] Citing Ex parte Perkins, 646 So.2d 46 (Ala. 1994), the main opinion states that "the trial court's judgment was based on an incorrect standard and it was necessary [in W.T.M. II] to remand the case to the trial court with directions that it (1) conduct another review of the record applying the correct standard and then (2) redetermine the custody award," and that "[t]his court had no authority to redetermine custody." 851 So.2d at 61. The rule recognized in Ex parte Perkins, however, is that deference is to be given a trial court's custody determination and that we will not reverse the determination, "`unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown.'" 646 So.2d at 47 (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)) (emphasis added). If the evidence of record in the present case "so fails to support" an award of custody to S.P. that, if such an award is made, we necessarily must on appeal reverse it as a matter of law, there would have been no need for this court to have remanded this case to the trial court for it to consider that issue. Ex parte Perkins recognizes that an appellate court may "decide that the facts are not as the trial court found them to be" if those "findings are not supported by the evidence and are clearly erroneous." Id. at 47. See also P.A.T v. K.T.G., 749 So.2d 454, 458 (Ala.Civ.App.1999) (notwithstanding the presumption in favor of a trial court's custody determination, "when the evidence contained in the record does not support the judgment, we have no alternative; we must reverse it"). Ex parte Perkins, however, was not such a case; there was sufficient evidence in Perkins to support a custody finding in favor of either party.

Ex parte Perkins stands for the proposition that where a trial court has imposed on a losing party a more difficult burden of proof as to an essential issue than it should have imposed (or imposed on a prevailing party an easier burden than it should have imposed), and there is in the record sufficient evidence from which the trial court, under the correct standard, reasonably could find in favor of either party as to that issue, the only appropriate course is to remand the case and allow the trial court to perform its role as the fact-finder. In the present case, there is substantial evidence on both sides of the best-interests issue, which is why this court was obligated in W.T.M. II to remand this case to the trial court and allow it to function as the fact-finder. On remand, the trial court performed that function.